704 F.2d 550
 113 L.R.R.M. (BNA) 2396, 97 Lab.Cas. P 10,107,
13 Fed. R. Evid. Serv. 33
 LANE CRANE SERVICE, INC., A Florida Corporation, Plaintiff-Appellee,
v.
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION
NO. 177, By and Through its agent, William H.
BROMMER, Defendant-Appellant.
MANNING ELECTRIC & REPAIR COMPANY, INC., Etc., Plaintiff-Appellee,
v.
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION
NO. 177, Etc., Defendant-Appellant.
 Nos. 82-5090, 82-5091.
 United States Court of Appeals,
Eleventh Circuit.
 May 2, 1983.
 
 Mahon, Mahon & Farley, P.A., Lacy Mahon, Jr., Joseph S. Farley Jr., Jacksonville, Fla., for defendant-appellant.
 Caven & Clark, Alan P. Clark, Jacksonville, Fla., for plaintiffs-appellees.
 Appeals from the United States District Court for the Middle District of Florida.
 Before RONEY and CLARK, Circuit Judges, and GIBSON*, Senior Circuit Judge.
 FLOYD R. GIBSON, Senior Circuit Judge:
 
 
 1
 Defendant International Brotherhood of Electrical Workers Local Union No. 177 (the union) appeals a jury verdict finding it liable for damages sustained by plaintiffs, a general contractor and a subcontractor, as a result of an alleged secondary boycott. The union picketed the work site of the contractor, a nonunion employer. The employees of the subcontractor, a union employer, walked off the job after the pickets were posted. The contractor and subcontractor brought actions accusing the union of conducting an illegal secondary boycott by picketing a gate reserved for the subcontractor's union employees. The union argued there was not a separate gate for the subcontractor. The jury found for the contractor and the subcontractor and the union appeals. We affirm the judgment of the district court.
 
 I.
 
 2
 In the spring of 1980 the City of Jacksonville, Florida, entered into a contract with Manning Electric & Repair Company (Manning, the contractor) to install a lighting system at a local ballpark. The subcontract to install light poles at the ballpark was awarded to Lane Crane Service, Inc. (Lane Crane, the subcontractor). Because Manning was a nonunion employer, union members picketed the ballpark, beginning on May 30, carrying signs saying Manning paid substandard wages. The signs clearly indicated the dispute was with Manning, not Lane Crane. On June 6 picket signs also protested the city's refusal to accept an offer by union members to donate labor for the project. On May 31 Lane Crane's union employees walked off the job and stayed off the job until June 6, when the National Labor Relations Board obtained a temporary restraining order from a federal district court. The NLRB actions followed the filing of unfair labor practice charges against the union by Manning and Lane Crane.
 
 
 3
 After the contractor noticed the pickets, he put up signs at two of the gates at the work site. One sign, at the Duval Street gate said: "Exclusively reserved for Lane Crane, its employees, suppliers. All others use gate at Franklin Street." The sign at the Franklin Street gate said: "Exclusively reserved for Manning Electric, its employees, suppliers. All others use gate at Duval Street." The sign on the Franklin (Manning) gate was removed on June 3; the Duval Street sign remained throughout the controversy. Manning sent mailgrams to the union advising it of the separate gate for Lane Crane and saying that picketing the Lane Crane (Duval Street) gate would constitute an illegal secondary boycott. There was some evidence that workers other than Lane Crane employees, including workers in unmarked Manning trucks as well as other persons, might have used the Lane Crane gate. The union members continued picketing at the Lane Crane gate after the signs went up and did not stop until the temporary restraining order was issued.
 
 
 4
 Manning and Lane Crane each brought an action for damages against the union alleging the picketing of the Lane Crane gate was an illegal secondary boycott in violation of Sec. 303 of the National Labor Relations Act. 29 U.S.C. Secs. 158(b)(4), 187 (1976). The union's defense was that there was not in fact a separate gate for Lane Crane employees and therefore the picketing near the Duval Street gate was not secondary picketing. The union also argued it was not responsible for the picketing. The cases were consolidated and tried before a jury which reached a verdict in favor of both Manning and Lane Crane. The district court entered a judgment of $12,639.63 for Manning and $22,511.99 for Lane Crane, including attorney's fees.
 
 
 5
 The union argues on appeal that (1) the evidence of the existence of a separate gate for Lane Crane was insufficient to send the case to the jury, entitling the union to a directed verdict, (2) the district court should have required a "clear and convincing" showing that the union was responsible for the picketing, and (3) the district court erred in admitting into evidence documents relating to unfair labor practice charges filed by Manning and Lane Crane with the NLRB against the union based on the picketing.
 
 II.
 
 6
 The law regarding secondary picketing is well stated in Texas Distributors v. Local Union No. 100, 598 F.2d 393 (5th Cir.1979). It is an unlawful labor practice for a union to engage in a secondary boycott by inducing a person to refuse to perform services where an object thereof is to force one employer to cease doing business with another employer or to force an employer to recognize the labor union as the representative of his employees unless the union is the legal representative of the employees. Informational picketing at a common work site advising the public that an employer pays substandard wages is lawful. However, even informational picketing, which was involved here, will be considered unlawful if any object of the picketing is for an unlawful purpose. The picketing will be unlawful if there is " 'an expectation or a hope or a desire that employees of the secondary employer will be induced or encouraged to take concerted action' to quit working behind the picket line in order that a prohibitive secondary effect on the primary employer will occur." Id. at 398, quoting Superior Derrick Corp. v. NLRB, 273 F.2d 891, 897 (5th Cir.), cert. denied, 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47 (1960).
 
 
 7
 Thus, it is necessary to determine the union's motive in the picketing. In determining the motive or object of the picketing, a court will look at the totality of the evidence. Texas Distributors, 598 F.2d at 399. Furthermore, in determining whether the union was entitled to a directed verdict, we must examine the evidence in the light most favorable to the parties opposing the motion for a directed verdict to determine if "reasonable men could not arrive at a contrary verdict." Cora Pub, Inc. v. Continental Casualty Co., 619 F.2d 482, 484 (5th Cir.1980), quoting Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969).
 
 
 8
 Part of the evidence of an improper motive on the union's part was evidence that the union knew that Lane Crane's union employees were likely to honor the picket line. Lane Crane's union representative testified that the defendant union's business agent told him that the picketing was sanctioned. Other evidence of an improper motive was the union's picketing of a separate gate marked for exclusive use by Lane Crane. The evidence of the existence of a separate gate was not undisputed; there was some evidence that persons other than Lane Crane employees used the gate, but the evidence did show a separately designated gate was provided for Lane Crane, its employees and suppliers. Also there was some confusion caused by the signs because for a few days both gates directed everyone other than Manning or Lane Crane employees to use the other gate, but the Manning sign at the Franklin gate was removed on June 3, thus eliminating any ambiguity or confusion between the two gates. The evidence regarding the union's motive was substantial. There was clearly enough evidence to submit to the jury the issue of whether one of the objects of the picketing was to get Lane Crane union workers to walk off the job. Lane Crane as a neutral employer should not have been subjected to a secondary boycott.
 
 
 9
 The union also argues the district court erroneously instructed the jury as to the plaintiff's burden of proof in making the union responsible for the picketing. The district court applied the preponderance of the evidence standard and the union argues the court should have used the "clear and convincing" standard. The union cites Sec. 6 of the Norris-LaGuardia Act, 29 U.S.C. Sec. 106 (1976), in support of its position. That section provides:
 
 
 10
 No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.
 
 
 11
 (Emphasis added). The Supreme Court has interpreted "clear proof" in this context to mean "clear, unequivocal, and convincing proof." United Mine Workers v. Gibbs, 383 U.S. 715, 737, 86 S.Ct. 1130, 1145, 16 L.Ed.2d 218 (1966). However, the Labor Management Relations Act was subsequently enacted, and it "expressly provides that for the purposes of that statute, including Sec. 303, the responsibility of a union for the acts of its members and officers is to be measured by reference to ordinary doctrines of agency, rather than the more stringent standards of Sec. 6." Gibbs, 383 U.S. at 736, 86 S.Ct. at 1144. See also 29 U.S.C. Secs. 152(13), 185(e), 187(b) (1976). Under the labor laws as amended and under the Supreme Court's interpretation of those laws in Gibbs, the clear and convincing standard does not apply to a secondary boycott claim.
 
 
 12
 The evidence is clearly sufficient to support the verdict under the preponderance of the evidence standard. The union's business agent told the members where to picket, when to picket, and the picket signs were purchased by the union. The pickets included a union officer and a member of the executive board. The membership was given a report on the picketing and the business agent noted that the pickets were "doing some good." Although the union did not expressly authorize or ratify the picketing, express authorization or ratification are not necessary for liability. 29 U.S.C. Sec. 152(13) (1976). There was ample evidence to find the union liable under ordinary agency standards.
 
 
 13
 The last issue the union raises is that it was prejudiced by the admission into evidence of Manning's and Lane Crane's filing of unfair labor practice charges with the NLRB against the union. The court instructed the jury the admission of the evidence of the charges was related solely to the issue of the union's notice of the charges and not to the truth of the matter asserted in the charges. The union's notice of the objections of Manning and Lane Crane to the picketing at the Lane Crane gate was relevant, and evidence of the filing of the charges with the NLRB was probative on the issue of the union's notice. The evidence was properly admitted.
 
 
 14
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Floyd R. Gibson, U.S. Circuit Judge for the Eighth Circuit, sitting by designation